CANIFO (CAMERON v.). See Case No. 2,-340.

## Case No. 2,383.

### CANIZARES v. The SANTISSIMA TRINIDAD.

[Bee, 353; [1] Hopk. Rep.]

Admiralty Court, D. Pennsylvania. 1788.

BOTTOMRY—GROUNDS OF HYPOTHECATION—EXTRA WAGES—MASTER'S AUTHORITY TO CONTRACT FOR.

1. The true grounds of hypothecation are the necessities of the case, and the want of personal credit.

2. A captain has no power to bind his owners and their vessel to the payment of mariner's wages for three months after his discharge, and after all services at sea and elsewhere have ceased.

"To the Honourable Francis Hopkinson, Esquire, Judge of the Court of Admiralty of the State of Pennsylvania:

"The bill of Manuel Sagas de Canizares respectfully sheweth: That Don Juan Joseph de Aguire Perez, of the city of Cadiz, in the kingdom of old Spain, now resident in the city of Philadelphia, was and is owner of a certain brigantine called the Santissima Trinidad; and that Narisco Sanchez y Serna was commander of the said brigantine, being thereto properly authorized and appointed, the said brigantine being of the burthen of 120 tons, or thereabouts. That the said Narisco Sanchez y Serna, being on the high seas and within the jurisdiction of this court, viz. at the Havannah, in the island of Cuba, was under the necessity of taking up money on the freight and property of the said brigantine, the said brigantine having suffered by

storms and tempests on the high seas, and the crew of the said brigantine being in want of provisions. In consequence whereof, and from the prolongation of the voyage thereby occasioned, the said Narisco Sanchez y Serna did then and there, upon the high seas, and within the jurisdiction of this court, borrow from Santiago Cupisono the sum of 200 Mexican dollars, equal to the sum of £75 lawful money of Pennsylvania; in consideration whereof, the said Narisco Sanchez y Serna did, on the 6th day of June, 1788, on the high seas, and within the jurisdiction of this court, by a certain writing, with the proper hand of the said Narisco Sanchez y Serna, then captain, thereto subscribed, (which said writing is here exhibited to this court) contract, covenant and agree with the said Santiago Cupisono, and to him did hypothecate the said brigantine, and her freight, in the words following, viz. (The contract, in the Spanish language), the meaning and purport of which words are as follows, towit: 'Received of Mr. Santiago Cupisono the sum of two hundred dollars, current money of Mexico, for the victualling and first expenses of the brigantine, which sum I will pay at first sight, in the name of the owner Don Juan Joseph de Aguire Perez, who is in Philadelphia: which cash I receive, mortgaging the freight, the brigantine and her rigging, as the said Santiago Cupisono has lent me the above sum for the advantage of the vessel at Havannah. June 6th, 1788. Narisco Sanchez y Serna.' And afterwards, to wit, on the 13th day of August, in the year of our Lord last aforesaid, the said Santiago Cupisono, by his endorsement on the said writing,[2] with his proper hand thereto subscribed, did order the contents to be paid to your libellant. And your libellant in fact says, that the said brigantine did arrive safely from the port of Havannah to the port of Philadelphia on the 12th day of October in the present year. And the said Narisco Sanchez y Serna, the said captain, did not, neither did the said Don Juan Joseph de Aguire Perez, owner of the same brigantine, pay, or cause to be paid, to your libellant, the said sum of 200 dollars, or any part thereof, which, according to the true intent and meaning of the said writings, so as aforesaid exhibited, the said Narisco Sanchez y Serna, and the said Don Juan Joseph de Aguire Perez ought to have paid to your libellant; although your libellant hath demanded the said sum both from the same Narisco Sanchez y Serna, the captain, and the said Don Juan Joseph de Aguire Perez, the owner, at Philadelphia aforesaid. And your libellant begs leave further to represent, that your libellant is an able seaman and pilot, well acquainted with the several harbours in the

---

[1] [Reported by Hon. Thomas Bee, District Judge.]

[2] Translation of the Endorsement.

"For me, pay to the order of Manuel Sagas de Canizares, the above expressed sum, for value received of him. Havannah, August 13th, 1788. Santiago Cupisono."

island of Cuba, and on the continent of North America, and, as such, was shipped on board the brigantine Santissima Trinidad at Havannah, by Narisco Sanchez y Serna, now or late captain, master and commander of the said brigantine, at the monthly wages in the account hereunto annexed,[3] mentioned; to sail from the said port of Havannah to the port of Philadelphia; and that it was stipulated by and between the said captain and your libellant, that in case the owners of the said brigantine should think proper to discharge your libellant at the port of Philadelphia, in such case, your libellant should receive three months' wages, and be furnished with a passage back to the said port of Havannah.[4] That the said brigantine did accordingly sail from the port of Havannah and arrive at the port of Philadelphia, and your libellant continued on board the said brigantine during all the said voyage, and did his duty as a seaman and a pilot aforesaid, until the said vessel arrived at the port of Philadelphia, and your libellant was discharged from doing any more duty on board the said brigantine by the captain and owner thereof. And although your libellant hath requested the said captain and the said owner to pay him three months' wages, and to furnish him with a passage back to the Havannah, according to the agreement aforesaid, yet the said captain and owner have hitherto refused, and still do refuse, to do the same. Wherefore, your libellant prays, that the process of this honourable court may issue against the said brigantine, and that she may be condemned by a sentence and decree of this honourable court, and that the said brigantine may be sold, and the money arising from such sale may be applied to the payment of the said several sums due to your libellant. And your libellant shall ever pray, &c. December 19, 1788."

HOPKINSON, District Judge. This libel states two separate claims of Canizares, the complainant, against the brigantine Santissima Trinidad. The one founded on an hypothecation of the said vessel, made by the then captain to Santiago Cupisono at Havannah, for 200 dollars advanced by the said Cupisono for necessaries for the said brigantine, as it is said, and to enable her to prosecute her voyage; which instrument of hypothecation is endorsed or assigned over by the lender to the present libellant: and the other, founded on a written contract between the said Narisco Sanchez y Serna, then captain, and Canizares, the libellant, made at Havannah, respecting the wages he should receive for serving as pilot and mariner on board the said brigantine, in her voyage from Havannah to Philadelphia. As these claims arise from different contracts, it is manifest that they must be separately considered.

To determine on the force of this instrument of bottomry, I shall first state the circumstances necessary to the formation of a genuine hypothecation, according to the maritime law; and then take a view of the history of this vessel's voyage, and her situation at the Havannah, when Cupisono advanced the money in question. As to the first, I have had occasion, in three former suits in this court, to state the doctrine respecting a maritime hypothecation, and have not since found reason to alter my opinion of the principles on which these causes were decided. The cases to which I refer were Liebart v. The Emperor [Case No. 8,340], Turnbull v. The Enterprize [Id. 14,242], and

---

[3] The Account Annexed to the Libel.

The Brigantine Santissima Trinidad, to Manuel Sagas de Canizares, Dr.

1788. Dec. 19.

| | £ | s | d |
|---|---|---|---|
| To cash lent in Havannah to Captain Narisco Sanchez y Serna, commander of the said brigantine, by Santiago Cupisono | 75 | 0 | 0 |
| To 5 months and 19 days' wages, from July 1st to Dec. 19th, at £7. 10s | 42 | 5 | 0 |
| To three months' pay, agreeable to contract | 22 | 10 | 0 |
| To his passage to Havannah | 22 | 10 | 0 |
| | 162 | 5 | 0 |
| Received in Havannah two months' advance | 15 | 0 | 0 |
| | 147 | 5 | 0 |
| To one month's boarding Mr. Canizares has been obliged to find | 5 | 12 | 6 |

[4] Translation of the Agreement.

"The commandant general of the navy, and the intendant general, &c. having both obliged me to take, as all other vessels do, a second pilot, as by order of his majesty, no vessel, small or great, can leave his dominions without having on board a first and second pilot. In consequence whereof, in the name of the owners, I have sought for Don Manuel Sagas de Canizares, second pilot of the navigation of Indies, and captain and first pilot in the French navy, as he has proved by his papers exhibited to the said intendant, in whose presence, treating of his wages, after having inquired of several other persons, found it more convenient and cheaper to pay him twenty dollars current money of America per month. And in case the owners think proper to suspend these commissions, they shall bring him back to this port of Havannah, paying him, above his wages, three months besides his passage, as the decency of his office requires it. And in all the ports where the said vessel shall go, he shall receive the half of the daily allowance of a first pilot, which is seven reals and 3-15 current money, and for a second pilot four reals; or in case he does not receive provisions, &c. agreeably to the ordinances of Bilboa and the regulations of the navy: and in case this present agreement should not be complied with, he shall present it to the minister, that he may oblige them to pay what is hereby promised. Two to be written of the same tenor; one for the warranty of Don Juan Joseph de Aguire Perez, to be signed in his name by the captain of his vessel, and another in the same manner to be left, as the original, in the naval office, with the commissary Mr. Domingo Labadores, each having the same strength, as if they had been made and executed before a notary public at Havannah. July 1st, 1788. Narisco Sanchez y Serna. Manuel Sagas de Canizares.

"Received in advance forty dollars. Manuel Sagas de Canizares."

Forbes v. The Hannah [Id. 4,925]. The first and third of these causes were carried into the high court of errors and appeals, were there again solemnly argued and considered, and, without the intervention of any new testimony to alter the case, the sentences of the admiralty were confirmed on the same, or nearly the same, principles. I can only now repeat the substance of what was then observed. (Here the judge recapitulated the doctrines advanced, and the authorities cited in the three foregoing causes, and then proceeded to say:)

"I shall now state the history of the voyage of this brigantine, as the same may be deduced from the testimony exhibited.[5] It appears, that this vessel was chartered on account of the king of Spain, and was to sail from Philadelphia with a cargo of flour for Carthagena; that the flour was there to be sold, and a cargo of dye-wood purchased and brought back to Philadelphia, or some port of the United States. Such was the designated voyage. But. it seems, the captain, instead of returning to Philadelphia from Carthagena, went to Jamaica with an adventure of his own; to what amount does not appear. That at Jamaica he purchased dry goods fit for the Havannah market, and then sailed with the brig to Havannah, where he disposed of the goods he had bought at Jamaica, on his own account. That at Havannah he borrowed 200 dollars of Cupisono, and executed the instrument called an hypothecation, to engage the vessel and her freight to Cupisono as security for this sum. That part of this money was expended in paying wages to the sailors, and part in supplying them with fresh provisions. That the vessel was refitted at the king's arsenal, and at the expense of the intendant. And that she afterwards sailed for and arrived at the port of Philadelphia. I agree with the counsel for the libellant, that the validity of an hypothecation ought not to depend upon the regularity of the captain's conduct with respect to his owners, previous to the time of her arrival in a foreign port, and of lending money for the relief of the ship's necessities; and will go farther, and say, that neither ought it to be affected by the captain's subsequent conduct, provided the lender was in no ways privy to, or knowingly assistant in, his obliquities.

---

[5] There was but one deposition produced in this cause, viz. that of the late captain of the brig. It might have been a question, whether his testimony was legally admissible or not, but he was not objected to as a witness by the proctors for either side. His deposition was in these words: "Narisco Sanchez y Serna, a witness produced on the part of the libellant in this cause, on his solemn oath on the holy Evangelists of Almighty God, saith: That he, this deponent, received the 200 dollars mentioned in the libel (he being then captain of the said brigantine at the Havannah) of Cupisono, by the hands of the libellant; which money, or any part thereof, he, the deponent, hath not paid to Cupisono again; and that he employed the said money in paying wages to the crew, and in furnishing fresh provisions, until he should receive money from the intendant. That a survey was ordered upon the vessel, and a report made to the intendant, and he then received a verbal order to take his vessel from the bay to the upper part of the harbour, where the king's warehouses are, there to discharge, and after that to transport his vessel to the king's arsenal, where she was repaired and had a new bottom. That he, the deponent, had no money, nor any person to whom he could apply to obtain the same. That the vessel leaked before he went into the Havannah to such a degree, as to make more than thirty inches of water in an hour. That he never knew Mr. Cupisono; but he had had three or four days' acquaintance with the libellant. That he requested the libellant to borrow him some money, and he took him to Mr. Cupisono's, where the money was paid to him. That the paper marked 'A,' exhibited in this cause and shown to him, is a contract made between the libellant and the deponent. That at the house of Cupisono, the said Cupisono insisted upon the vessel and freight being hypothecated to him, otherwise he would not lend the money. That Cupisono knew that the vessel put in in distress—that every body knew it, and that he, the deponent, had told Cupisono of it.

"Being crossexamined, he saith, that the sailing orders (marked 'B') are the sailing orders he received. That the paper (marked 'C') is the charter-party signed between him and the freighter. That the paper (marked 'D') is the account delivered by the deponent, on his return, to his owners. Being asked how he came to apply to the intendant for money, he saith, that he presented a memorial to him for that purpose. Being asked whether he got any money in consequence of the memorial, he says, that he did not; but he was obliged to present five or six memorials. Being asked, how long after he arrived at the Havannah he presented a memorial, he answers, that he received the money from Cupisono the first Sunday after his arrival. Being asked on what day he arrived at the Havannah, he answers, that he does not remember whether it was on Thursday or Wednesday; that the memorial was presented to the intendant after the money was received from Cupisono. That in the conversation he had with Cupisono, he told him that he expected to receive money from the intendant, as he was chartered on account of the king. That he took on board a passenger at St. Martha, who was to proceed with him to this country. Being asked, whether, being at Jamaica, he did not dispose of an adventure of his own, he answered, he did, but they were not goods of the king's; that he invested the proceeds in dry goods, which he intended to dispose of at the Havannah. That he told Cupisono that he had contraband goods on board which he had brought from Jamaica. That in the course of conversations with Cupisono (for he had several) he does not recollect particulars. That Cupisono did not ask him the nature of his voyage. That Cupisono knew that the vessel was freighted with dye-wood on account of the king, and was designed for some port in the United States. That he had informed Cupisono that he had received money from the intendant; but that a little while before he sailed he met Cupisono, who asked him how he was off for money? to which the deponent replied, that he should be much straitened, whereupon the agreement (marked 'E,' exhibited in this cause) was made and executed between them. That he was near two months and an half at the Havannah. Being asked, whether the paper (marked 'E') was given on the day it bears date, he answers, that it was not given on the day it bears date, nor does he recollect whether it was the day after, or three or four days after, but that the money was bona fide paid by Cupisono and received by the deponent, and that he does not recollect when the paper (marked 'E' the hypothecation bond) was executed."

It has been urged on the other side, that the law of hypothecation was designed solely for the benefit of the owners, and an inference drawn, that if it can be shewn that the owners of a vessel have not been benefited, but injured, by the captain's conduct and consequent hypothecation, it ought not to be allowed. But this law has for its object the good of commerce in general. And no stranger would lend money on hypothecation, if his lien on the ship was to be invalidated by some future proof that the voyage was irregular, or that the captain had deviated from the orders of his owners and injured their interests, either before or after the hypothecation made. But where shall we find, in the present case, that necessity which should justify the captain's conduct, and be the ground of a genuine hypothecation? This vessel was chartered by the king of Spain or his agent, the cargo on board was on the king's account, and she arrives in a leaky and disabled condition in one of his majesty's ports, where he had an officer stationed. This officer, the intendant, orders the brig to the public warehouse to be discharged, and then round to the king's arsenal to be repaired; all which was done at the king's expense. In truth, I cannot conceive a case of less necessity, or one wherein a more certain and able relief could be depended upon.

But, it is said, there were considerable delays before the intendant interfered, and that the captain was obliged to send in five or six memorials, and in the mean time the mariners were in great want of wages and fresh provisions, and that in this necessity the captain applied to Cupisono for 200 dollars, who refused to lend them unless the vessel should be hypothecated for his security. It appears, however, by the deposition, that the money was lent by Cupisono before the captain had made any application at all to the intendant, and therefore the neglect of the intendant could not have occasioned the necessity of borrowing money from Cupisono. That the captain of a vessel in the king's service, and in one of his majesty's ports, should not have credit for a few days' provisions, until the proper officer could be applied to, is too incredible to be seriously admitted. Still less can it be a sufficient ground for an hypothecation, that the mariners must have wages paid to them, in a place where it does not appear that any wages were due, nor is it probable that any could be due, because this was neither the conclusion of the voyage, nor even a port of delivery. The money ought to have been lent solely on the faith of the hypothecation, and not on any personal credit; but here was a strong and well founded credit, for it is in testimony that Cupisono knew that this brig was chartered for the king's service, and it is expressly said, that the money was borrowed to pay wages and procure fresh provisions until money could be had from the intendant.

Further, in the quotation from Molloy, b. ii. c. 11. s. 11. it is said: "When a master is out of the country, and where he hath no owners, nor any goods of theirs, nor of his own," &c. Now it is confest that the captain had property of his own, and, as it should seem, to a considerable amount, since it was sufficient to induce him to violate his duty to his owners, in taking the brig, contrary to their orders,[9] on a trading voyage to Jamaica for his own benefit; that at Jamaica he bought goods suitable for the Havannah market, and actually sold them at Havannah, though contraband—and that Cupisono, the lender, was privy to these circumstances. So that, instead of the lender's having the brig alone to look to for his security, he had two substantial personal credits to depend upon, viz. the intendant from whom he might expect repayment of moneys advanced for the use of a vessel in the king's employ, and the captain, whose property he might have attached before he left the island, if satisfaction was not made. This circumstance alone, that is to say, Cupisono's knowledge that the captain had property of his own on the spot, sufficient to answer the present exigencies of the vessel, would have invalidated the bond as a maritime hypothecation, inasmuch as it removes that necessity which the law requires.

There is a circumstance in the present case, which, although not in itself conclusive, forms too striking a feature in the transaction to pass unnoticed. A singularity peculiar in a maritime hypothecation is, that the law allows an extraordinary premium or interest to the lender, even to any extent, according to the risk to be run; because, if the ship should be lost, the money lent is lost with her. But here a stranger lends 200 dollars to a captain in distress, without even stipulating for common legal interest for the use of his money. I say, this alone might not be conclusive against the hypothecation, because a stranger may be as

---

[9] Translation of the Sailing Orders.

"Philadelphia, 18th of October, 1787. Don Narisco Sanchez—Dear Sir: You will observe the following orders: When you arrive at Carthagena, you will say that you carry 300 barrels of flour for the king and troops. You will deliver my letter to Don Manuel Garcia del Rio, to whom it is directed. He will sell your venture and remit me the amount to pay your creditors. You must not stay long in these ports, and if you have the good luck to be despatched soon, you will come back with the cargo of dyewood, which you will take at that port. If it is in January and the river is frozen, you will go to New York, where you will deliver your cargo to Don Sabrados de los Monterros, and will write me by post. You will take a particular care of your people, and suffer no disorder. The said Don Garcia will give you the cash you shall want for the provisions of the brig, desiring you to be very saving in all, but let nothing be wanted, and keep good order. In case you should not be despatched soon, you will present a memorial to the viceroy, conforming yourself to the charter-party. May God grant you a good voyage. Juan Joseph de Aguire Perez."

generous as he pleases; but, in connexion with the other circumstances, it gives room for suspicion that the engagement of the brig to Cupisono was not made within the rules and spirit of the maritime law. For the above reasons, I adjudge that the bill in this cause be dismissed, so far as the same hath respect to a claim of 200 dollars, said to have been lent on the credit of the brig Santissima Trinidad.

I am now to consider the libellant's demand of wages for serving as pilot and mariner on board this vessel from Havannah to Philadelphia. The counsel for the libellant hath rested his claim of £87 5s. for wages, on a written contract made at the Havannah, between Narisco Sanchez y Serna, then captain, and Canizares. But it has been contended, on the other side, that as this agreement is in writing, and bears a seal, and is not, according to the terms thereof, in the usual way of agreeing for mariners' wages, it becomes a special contract, and is not properly of admiralty jurisdiction. Its being in writing, however, is no more than a testimony or memorandum of the agreement made, and does not affect the jurisdiction of this court. What is called a seal, appears to be nothing more than a printed stamp, for which a duty is paid to the crown: certainly. it is not the seal of the parties, or of either of them. But, as to the terms of the contract, these are indeed out of the usual course, and deserve further consideration.

One of the reasons for allowing mariners to sue in the admiralty for their wages is, that the debt arises from services performed, or to be performed, at sea; and a lien on the ship is given them for security, because the contract they make is supposed to be on the credit of the ship. Now, although the wages of 20 dollars per month, promised in the present case, appear to be extravagant, yet as the difficulty of getting a person qualified to serve both as a skilful pilot and able mariner might have been great, I think the rate of wages per month ought to be allowed as contracted for. But I cannot, upon any principle, allow, that a captain hath a power to bind his owners and their vessel to the payment of a mariner's wages for three months after his discharge, and after all services at sea or elsewhere have ceased. If he could legally do this for three months, why not for six or for twelve months, or even saddle his owners with an annuity for life to a mariner, for a few weeks' actual service? How far the common law might consider this contract as binding on the captain personally, it is not my business to say; but, as judge of admiralty, I shall be far from doing my part towards establishing a precedent by which captains, in addition to the great power they necessarily have over the property of their employers, may have that of obliging them to the payment of unlimited sums for an unlimited time. The captain might

have engaged for his owners, to pay wages per month during the service, or a specific sum for the run, to any amount justifiable by the circumstances and necessities of the case; but to bind the owner to periodical payments to a mariner, after a total discharge from the service, is what I believe no captain of a vessel ever before attempted. For, whether this was to be paid all at once, or at three several times, it matters not; the contract is for three months' wages after discharge.

There is another claim under this contract for 60 dollars, to take the libellant back to the Havannah, on being discharged here. The maritime custom is, that if a master or owner. discharge a mariner in a foreign port, before the completion of the voyage for which he is engaged, some reasonable allowance shall be made, over and above the wages due, to enable him to return to his own country, or to go to the port which, by the articles, should have completed the voyage. And this allowance is usually the amount of one month's wages. And it is a reasonable custom, where the mariner is willing to perform articles and finish the voyage, but the master or owner thinks fit to discharge him sooner, for their own convenience, and without just cause of complaint against the mariner. This part of the contract before us is, therefore, consistent with maritime custom, but certainly unreasonable as to the sum promised. Whatever power a captain may have by law to bind his owners by contracts made abroad for the services of the ship, yet he cannot oblige them beyond what is usual and customary, without shewing that the unusual charge arose from the necessity of the case. The present charge is expressly made for conveying the libellant back to the Havannah. I have therefore inquired what is the usual charge for a passage from this port to the Havannah, and find that 40 dollars is an ample and generous allowance.

Fraud and collusion between the captain and Canizares, the libellant, have been suggested, but not proved. Yet, if I had not found that this cause might and ought to be determined on general principles, there are two circumstances in the case which would have induced a more strict inquiry into this captain's conduct. The one, which I have already noticed, is Cupisono's lending money on hypothecation, without securing or even asking for common interest; which, though a possible, is not a usual occurrence. The other, is a contract between the captain and Canizares, which concludes with these remarkable words—"Each," (that is, the original and copy) "having the same strength as if they had been executed before a notary public at Havannah." The question naturally occurs, and why was not this contract made and executed before a notary public at the Havannah? An honest captain, who is reduced to the necessity of binding his

owners to hard and unusual terms, would at least take care that nothing should be wanting in point of form and public notoriety to justify his conduct. And, besides, I suspect that this contract, which bears a printed seal, or stamp, could not be legally executed, according to the regulations of the Spanish maritime laws and customs, but in the presence of a notary, or some public officer. But it was not necesary to clear up these appearances, as the cause may be decided on other grounds.

Upon the whole, I adjudge and decree, that Canizares, the libellant, have and receive from Juan Joseph de Aguire Perez, the respondent, the sum of 112 dollars and 60-90ths of a dollar, equal to £12 5s. Pennsylvania currency—that is to say—

| | £. | s. | d. |
|---|---|---|---|
| For five months and nineteen days' wages, from July 1st to December 19th, at twenty dollars per month.. | 42 | 5 | 0 |
| For his passage to the Havannah.. | 15 | 0 | 0 |
| | 57 | 5 | 0 |
| From which deduct forty dollars paid in advance at Havannah........ | 15 | 0 | 0 |
| There remains................. | 42 | 5 | 0 |

With respect to the £5 12s. 6d. added to the account, and charged for a month's boarding, I shall take no further notice of it than to observe, that it is neither mentioned in the libel, nor supported by any vouchers or testimony whatever. Finally, I adjudge, that the libellant pay one half, and that the respondent pay the other half, of the costs and charges of this suit.